# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ERIC VON SCHLICHTEN,** | : | **Civil No. 1:16-CV-1473** |
| | : | |
| **Plaintiff** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **v.** | : | |
| | : | |
| **VINCENT MOONEY, et al.,** | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM OPINION

### I.    Introduction and Statement of the Case

On August 10, 2015, Dwight Dros, the Records Supervisor at the State Correctional Institution at Coal Township, expedited the release of Eric Von Schlichten, an inmate held at this facility, after receiving a state court order which for the first time clearly stated that prior state court records relied upon by prison officials to calculate Von Schlichten's sentence credit were in error. Alerted to this error, Dros acted with dispatch, securing Von Schlichten's release within 24 hours, but it is undisputed that this error resulted in Von Schlichten's detention beyond what should have been his release date.

This prolonged detention was a collective failure of the criminal justice system. Many factors combined to cause this collective failure. Thus, this detention was a product of a confluence of events, most notably: Von Schlichten's complex

criminal history and limited communications skills; the submission of erroneous court records by the sentencing court, records that prison officials were mandated by law to rely upon in determining Von Schlichten's release date; ineffective communication by counsel to prison officials; and fatally ambiguous court orders which did not plainly identify any sentencing credit calculation errors for prison officials until August 10, 2015.

None of these collective failures can fairly be attributed to Defendant Dros, but Defendant Dros remains the sole individual presently charged with civil culpability in this matter. Dros's liability in this case rests on the premise that he displayed what amounted to deliberate indifference to Von Schlichten's clearly established constitutional rights in April of 2015, when he reviewed the court records which by law constituted the court's sentencing order in response to an ambiguous court order which directed that Von Schlichten receive proper sentencing credit, and confirmed on the basis of those court records that Von Schlichten's sentencing credit had been properly calculated. Thus, Von Schlichten invites us to place upon Dros a clearly established constitutional responsibility in response to an ambiguous court directive to go beyond the court records that as a matter of law constituted Von Schlichten's sentencing order, and conduct an independent investigation or audit to ferret out whether further sentence credits that

had not been identified by the court were somehow embedded within multiple state court dockets.

Because we conclude, consistent with settled case law, that this collective failure by multiple actors cannot now be laid exclusively at the feet of Defendant Dros, and find that Dros's actions, which ultimately led to Von Schlichten's release, did not transgress the plaintiff's clearly established constitutional rights, we will decline this invitation and enter judgment in favor of Defendant Dros on this Eighth Amendment excessive confinement claim.

The plaintiff in this action is Eric Von Schlichten, a former inmate of the Pennsylvania Department of Corrections who has autism and limited ability to advocate on his own behalf. In September 2013, Judge Emil Giordano of the Court of Common Pleas for Northampton County sentenced Von Schlichten to an aggregate sentence of one to five years in prison upon finding him guilty of one count of engaging in public lewdness and one count of indecent exposure. At the time he was sentenced Von Schlichten had spent a number of months in the custody of the Northampton County Prison, both in 2010 and in 2013. Pursuant to the terms and conditions of the sentence, Von Schlichten was to receive credit against his sentence for all time served in Northampton County. However, Northampton County failed to indicate in the documents transmitted with the sentencing Order that Von Schlichten had been in custody as early as January

2010, and thus calculated his release date based upon the date he was received into DOC custody in September 2013, with credit for time served in county prison from February 11, 2013, until September 6, 2013.

In this civil action, Von Schlichten has a single claim remaining against Dwight Dros, the Records Supervisor at the State Correctional Institution at Coal Township, alleging that Dros violated the Eighth Amendment to the United States Constitution by failing to accurately calculate Von Schlichten's release date, and failing to undertake a reasonable inquiry to correctly determine Von Schlichten's sentence and his proper release date, even after receiving information that the plaintiff contends put Dros on notice that Von Schlichten was being held past his maximum sentence date. The plaintiff alleges that Dros was deliberately indifferent to his obligation to correctly compute the plaintiff's sentence, and to the danger that Von Schlichten would be held past his release date.

Although there is no real dispute that Von Schlichten was held more than 150 days beyond what was ultimately determined by the Court of Common Pleas of Northampton County to be his correct release date, there is a substantial dispute between the parties over whether Dros bears responsibility for a computational error, or whether he reasonably and properly based his calculation on the records that Northampton County provided to the Department of Corrections at the time of

sentencing, and whether he acted reasonably in response to Orders from the sentencing court.

When Von Schlichten was sentenced on September 6, 2013, the sentencing court's Order directed that he was to receive credit for all time served while previously in the custody of Northampton County. That Order, however, did not specify when Von Schlichten was in the County's custody. Instead, that information was submitted in a document that the County provided to the Department of Corrections that was used to calculate Von Schlichten's sentence. That document, in turn, omitted any mention that Von Schlichten had been in the County's prison for several months in 2010, instead indicating only that Von Schlichten had been in the County's custody for several months in 2013.

The Department of Corrections then calculated Von Schlichten's release date based upon the information provided by the sentencing court without crediting the plaintiff for the time spent in local custody in 2010. There seems to be no dispute that this calculation accurately reflected the information initially provided by the state court, and it is undisputed that Dros played no role in this initial sentence credit calculation. Nevertheless, the plaintiff claims that Dross was put on notice that further inquiry into Von Schlichten's sentence computation was necessary when, in April 2015, the sentencing judge issued another Order that did nothing more than echo the court's original sentencing order, which provided that

Von Schlichten was to receive credit for all time previously served in the County. This April 2015 had an enigmatic quality. This Order did not, in fact, indicate that Von Schlichten's sentence had been improperly calculated; it did not reveal that Von Schlichten had been in custody in 2010; and it did not give any specific guidance regarding the dates that should be used for sentence calculation. Instead, it simply repeated the directive that Von Schlichten's sentence be credited against the time that he was previously in Northampton County Prison.

For his part, Dros has testified that he found Judge Giordano's second Order to be "vague," but it did not inspire him to contact the Judge's chambers or to undertake further inquiry into sentence calculation beyond that which he had previously done, which was to check the documents from the Northampton County courts that accompanied the original sentencing Order, which also omitted any reference to Von Schlichten having been in custody in 2010. The plaintiff alleges that this response to the Order was so inadequate that it exhibited deliberate indifference to the possibility that Von Schlichten was then being held past his actual release date, and argues that Dros would have realized the problem with the calculation had he looked through Von Schlichten's entire file and not relied upon those Northampton County court records that the DOC is required by law to consider when it first calculated the plaintiff's sentence. However, Von Schlichten has offered little by way of persuasive legal authority for this assertion that the

arguably "vague" Order from the sentencing court compelled Dros to take the particular action that Von Schlichten now contends was necessary.

Moreover, the facts of this case, viewed objectively and construed in the light most favorable to the plaintiff, substantially undermine Von Schlichten's contention that Dros was deliberately indifferent to holding him past his maximum sentence date. Although Von Schlichten's defense lawyer and the prosecutor jointly approached the sentencing judge with defense counsel's concern about the DOC's calculation of Von Schlichten's sentence, it appears that they did not press for the court to issue an Order that made this point clear, or that otherwise explained in any detail the reason the sentencing court was issuing an Order that did nothing more than echo the court's original sentencing Order. That April 2015 Order did not alert Dros to any concerns over the potential miscalculation of Von Schlichten's sentence, nor did it direct him to take any specific action in response to the Order other than to ensure that the sentence was being calculated as originally directed – something Dros apparently believed he had done.

Moreover, when the sentencing court issued a third Order on July 31, 2015, which was received by prison officials on August 10, 2015, the Order expressly provided that Von Schlichten was to be credited for a period of time in 2010 when he was in custody in Northampton County. This third Order, now manifestly clearer and more detailed in both its purpose and command, caused Dros to realize

that the additional credited period would place Von Schlichten over his maximum sentence date. The evidence, discussed further below, indicates that after verifying the validity of the Order, Dros requested that a new sentence be calculated, and this was completed the same day. Von Schlichten was then immediately processed for release, and was in fact released from SCI Coal Township the very next day, August 11, 2015.

On this set of facts, largely agreed upon by the parties, Defendant Dros has moved for summary judgment, arguing that the evidence is insufficient to show that he acted with deliberate indifference to Von Schlichten's liberty interests. Upon careful consideration of the evidence in this case, we agree.

Although it is absolutely and entirely regrettable when an inmate is held over his or her maximum sentence date, the fact that an inmate was subjected to overlong incarceration will not, in and of itself, suffice to impose Eighth Amendment liability against prison officials. Instead, liability for such a violation will only attach where a plaintiff shows that an individual defendant exhibited deliberate indifference to whether the plaintiff suffered an unjustified deprivation of his liberty. The evidence in this case is inadequate to demonstrate such indifference on Dros's part. Furthermore, the evidence actually indicates that Dros adhered to DOC policy in calculating Von Schlichten's release date based on information supplied from Northampton County, and subsequently acted

immediately to process Von Schlichten's release after the sentencing court for the first time made clear on August 10, 2015, that Von Schlichten should have received credit for time spent in custody in 2010 – something that had never previously been made clear in either the sentencing Order, or the document from the County that was attached to the Order. Accordingly, for the reasons discussed below, we find that the plaintiff's remaining Eighth Amendment claim against Dros fails as a matter of law, and find further that Dros would be entitled to qualified immunity from liability based on the undisputed facts of this case and the state of the law at the time relevant to this action.

## II.  <u>Factual Background</u>

On September 6, 2013, the Judge Giordano of the Court of Common Pleas of Northampton County sentenced Eric Von Schlichten to serve one to five years in a state correctional facility following his conviction for public lewdness and indecency. (Def. SMF ¶ 1.) The court's sentencing Order provided that the Order and "the attached Northampton County Court of Common Pleas Sentencing Sheet are to be considered the Sentencing Order by the Pennsylvania Department of Corrections. The sentencing sheet accurately reflects the sentence of this Court at the above-referenced case number. . . . The Defendant's sentence is . . . concurrent . . . to other sentences . . . . The Defendant is to be given credit for time served, with no periods of duplicate credit." (Doc. 28, Ex. A, at DEF000677.)

The form attached to the Court's Order, a DC-300B "Court Commitment" statement expressly provided that Von Schlichten's credit for time served included time spent in Northampton County Prison from February 11, 2013, through September 6, 2013. (Id. at DEF000672, DEF000678-000679, DEF000684.) The time-served part of the DC-300B was handwritten by someone at Northampton County, a practice that is not uncommon. (Def. SMF ¶ 13.) The DC-300B contained no information about any periods of time when Von Schlichten was in Northampton County custody other than the dates in 2013.

The DC-300B is the court commitment form provided by the sentencing county to relay an offender's sentence to the Pennsylvania Department of Corrections, 42 Pa. Cons. Stat. Ann. § 9764, and the DOC accordingly considers the DC-300B to be part of the Sentencing Order from the county – just as Judge Giordano directed. (Def. SMF ¶¶ 10-11.) The evidence reflects that the DOC's Central Sentence Computation Unit ("CSCU") is responsible for calculating the sentences for all new offenders entering state correctional institutions. (Def. SMF ¶ 8.) These sentencing calculations are reflected on a form titled DC16-E – Sentence Status Summary, a form referred to simply as the "16E". (Def. SMF ¶ 9; Pl. Resp. ¶ 9.)

There is no dispute that the CSCU initially calculated the plaintiff's sentence based on a review of the September 6, 2013 Order and the DC-300B forms that

Northampton County completed and which were included with Judge Giordano's Order. In following this course CSCU did precisely what Judge Giordano expressly ordered when he directed that his Order and the sentencing sheet be read together and that the sentencing sheet "accurately reflects the sentence of this Court . . . ." (Doc. 28, Ex. A, DEF000677; Def. SMF ¶ 12.) There is also no dispute that when a court grants credit for time served and the DC-300B provides dates for the credit, the dates on the DC-300B are to be followed. It is only where there is a discrepancy between the credit awarded in the Order and the dates listed on the DC-300B that the sentencing court is contacted for clarification. (Def. SMF ¶ 14.)

Corrections officials are not entitled to unilaterally deviate from the court's instructions when construing the court's sentence. Therefore, if an inmate, or his family member, believes that he is being held past his maximum date or believes that the inmate is entitled to additional credit not awarded by the sentencing judge, they are referred to the inmate's attorney or the court to have the matter corrected. (Def. SMF ¶16; Dros Dep. at 185:13-21, 187:17-188:13.) In addition, when contacted by defense attorneys regarding court orders awarding credit, the Records Administrator in the CSCU explains that the DOC needs specific dates, a date range, or an amount of time to apply credit to an inmate's sentence. (Def. SMF ¶

17.)  Credit adjustments which would result in a change to the inmate's sentence structure are calculated by the CSCU.  (Id. ¶18.)

After Von Schlichten was sentenced on September 6, 2013, he was received at SCI Coal Township to begin serving his sentence.  The DOC subsequently received 94 pages of documents from Northampton County regarding time that he had been imprisoned in the county prior to his sentence.  (Doc. 35, Ex. A at DEF000424-28, DEF000513-41, DEF000555-67, DEF000568-88, DEF000619-45.)  These documents were placed in Von Schlichten's DC-15, a one-inch thick folder maintained by Defendant Dros and his team in the Records Department at SCI Coal Township.  (Doc. 35, Ex. F, Deposition of Dwight Dros at 94:7-95:24.)  Some of these documents indicated that Von Schlichten had been in Northampton County custody for a period of time in 2010.  (Pl. SMF ¶ 11.)  However, the DC-300B did not contain this information and did not provide credit against Von Schlichten's sentence for this 2010 incarceration.

On April 17, 2015, Von Schlichten's defense lawyer appeared before Judge Giordano to express concern that his client had not been given credit for all time served in Northampton County.  (Doc. 35, Ex. C, Affidavit of Brian Lawser at ¶¶8-11.)  While counsel voiced this concern, according to Attorney Lawser, during this meeting with Judge Giordano, he did not ask the Court to change or modify Von Schlichten's sentence.  (Id. ¶11.)  As a result of this conference Judge Giordano

issued another Order that simply stated: "AND NOW, this 17th day of April, 2015, Eric Von Schlichten is to receive credit for all time served in Northampton County towards his sentence." (Doc. 35, Ex. D.) The Assistant District Attorney and Von Schlichten's probation officer were also in attendance at this meeting, and did not object to the Order. (Lawser Aff. at ¶13.)

This April 15, 2017 Order, by its terms, did not provide any indication as to why it was being issued, nor did it provide any indication that DOC officials were not giving Von Schlichten credit for time served in Northampton County. Nor did the order express any concern that Von Schlichten's sentence credit calculation was in error. The order also neglected to make any reference to Von Schlichten's 2010 incarceration. Instead, the Order simply reiterated what was previously reflected in the Court's September 6, 2013 Order, which again directed that Von Schlichten receive credit for time served, and then incorporated by reference the DC-300B that indicated Von Schlichten had been in Northampton County's custody from February 11, 2013 until September 6, 2013.

Upon receiving Judge Giordano's April 17, 2015 Order, Dros concedes that he found it to be "vague," (Dros Dep. at 170:6-173:6), but neither Defendant Dros nor anybody else at SCI Coal Township contacted Judge Giordano's chambers to clarify the meaning behind the Order. (Pl. SMF ¶19.) Likewise, Defendant Dros did not contact Northampton County to ensure that Von Schlichten's DC-300B

was accurate. (Pl. SMF ¶ 21.) At the same time, it appears that Von Schlichten's lawyer – the moving force behind obtaining the April 17, 2015 Order – did not contact SCI Coal Township to express concern that his client was being held past his maximum sentence date, or to explain the reason that Judge Giordano had issued the Order.

According to Dros, after he received the April 17, 2015 Order, he personally reviewed Von Schlichten's DC-16E against the County's DC-300B. Thus, presented with this ambiguous order, Dros once again reviewed the state court record which as a matter of state law was incorporated into the court's sentence, the DC-330B. However, after this review confirmed the DOC's original sentence calculation because the state court documents omitted any reference to time that Von Schlichten served in Northampton County in 2010, he took no additional action to further review the DC-15 to see if it contained any additional or contrary information. (Dros. Dep. at 170:18-21, 170:6-9, 181:18-182:3.)

By May 7, 2015, Von Schlichten was still in DOC custody, and his lawyer served a subpoena on SCI Coal Township requesting records relating to the calculation of his client's sentence, including documents relating to the calculation of time served. (Lawser Aff. ¶16-17.) In response, the DOC produced the DC-300B documentation that had been used to calculate Von Schlichten's sentence, but did not include other documents from the DC-15, which the plaintiff argues

showed that he had been held in Northampton County in 2010, and should have been credited against his sentence.  (Pl. SMF ¶ 22.)

This was a missed opportunity to clarify sentencing confusion since counsel chose to subpoena prison records instead of simply explaining that he believed that there was a sentence calculation error. Rather than follow up with officials at SCI Coal Township about his concerns with the sentence calculation, Attorney Lawser again went to Judge Giordano, and requested a follow-up conference, which was scheduled for July 31, 2015.  At this conference, Judge Giordano issued a third Order which for the first time detailed in sixteen numbered paragraphs all of the dates that Von Schlichten actually had served in Northampton County on cases 1208-2010, 1209-2010, and 1210-2010, and expressly directed that Von Schlichten be given credit for all of this time.  (Doc. 35, Ex. B, at DEF000615-17.)  That Order stated that "[Von Schlichten] is entitled to credit toward his sentences and shall receive credit toward his current sentences of the following time periods:  (1) January 22, 2010 through January 28, 2010; and (2) March 24, 2010 to the present day."  (Id.)

Judge Giordano's July 31, 2015 Order was not sent to SCI Coal Township until August 4, 2015, and was not received until August 10, 2015.  (Def. SMF ¶6.) It is undisputed that the court and counsel did not treat this sentencing error as a matter of urgency since it took the court and counsel nearly two weeks to deliver

15

this order to this prison. However, upon receipt of the order Dros acted with dispatch. Upon receipt of the Order, Defendant Dros passed it along to the CSCU for processing, realized that Von Schlichten was being held past his maximum date based upon the dates provided, and immediately moved to process his release. (Def. SMF ¶7; Dros Dep. at 164:21-167:22.) In addition, Dros contacted Judge Giordano's chambers to verify the validity of the Order. (Dros. Dep. at 156:23-157:13.) The CSCU received Judge Giordano's July 31, 2015 Order on August 10, 2015, and on that day applied the credits specified in the Order to Von Schlichten's sentence and created at new DC-16E. At Defendant Dros's instruction, SCI Coal Township began processing Von Schlichten for release on August 10, 2015, and he was released from custody the following day. (Def. SMF ¶¶7, 37.)

In addition to an absence of evidence showing that Von Schlichten's attorney had contacted DOC officials to express concern that his client was not being given appropriate credit for time served in Northampton County, there is no evidence that the plaintiff or his mother, who frequently contacted prison officials to express concerns about her son, complained that he was not being credited for time spent in county custody. There is evidence showing that in March of 2014, Von Schlichten – with the help of another inmate – sent a request to staff in the records department at SCI Coal Township asking about his maximum date. (Doc. 35, Ex. N.) According to the plaintiff, he believed his sentence was incorrectly

calculated because his mother told him that it was. (Deposition of Eric Von Schlichten at 15:23-16:7.) The records department responded to this request on March 12, 2014, confirming that his sentence was correctly calculated. ((Doc. 35, Ex. N.) Notably, Defendant Dros was not employed at SCI Coal Township on March 12, 2014. (Def. SMF ¶ 49; Dros Dep. at 115:19-23.) Indeed, Dros remained unaware of Von Schlichten's request to staff until he reviewed the file in connection with this lawsuit. (Dros Dep. at 113:15-18.)

In addition, Von Schlichten's mother, Diana Von Schlichten, did not send any letters or other correspondence to Defendant Dros. (Dros Dep. at 184:12-15.) At one point in 2015, Ms. Von Schlichten spoke to Defendant Dros and expressed only her view that her son did not belong in prison. (Dros Dep. at 30:2-15.) Ms. Von Schlichten testified that Defendant Dros told her that if she believed her son was being held beyond his maximum date she needed to speak to a lawyer or to the sentencing court. (Deposition of Diana Von Schlichten at 90:1-12.) Ms. Von Schlichten never spoke with anyone else in the records department at SCI Coal Township. (Id. at 91:8-12.) Indeed, Ms. Von Schlichten conceded that she did not know how SCI Coal Township calculated her son's sentence, had never seen the sentencing documents from Northampton County, and had never seen Judge Giordano's April 17, 2015 Order prior to this litigation. (Id. at 73:9-11, 73:14-19, 121:20-25.) In fact, Ms. Von Schlichten believed that her son had maxed out his

sentence in Northampton County, before he was sentenced to additional time in a DOC prison on September 6, 2013.  (Id. at 95:3-17.)

The Superintendent at SCI Coal Township, Vincent Mooney, recalled that Ms. Von Schlichten sent letters and faxes claiming that her son was being mistreated and held inappropriately, but did not remember any of the correspondence stating that the plaintiff's release date had been improperly calculated.  (Deposition of Vincent Mooney at 62:14-17, 65:5-13, 95:3-13.) Superintendent Mooney's former secretary, Karen Leonard, testified that she received phone calls from Ms. Von Schlichten in which she opined that her son did not belong in an institution because he had autism.  (Deposition of Karen Leonard at 12:24-13:18, 23:25-24:13.)  Ms. Leonard testified that Ms. Von Schlichten never mentioned the plaintiff's release date or sentence calculation during their conversations.  (Id. at 24:7-10.)

III.  **Standard of Review**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In evaluating a motion for summary judgment, a court must determine "whether the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact and whether the moving party is therefore entitled to

judgment as a matter of law." Macfarlan v. Ivy Hill SNF, LLC, 675 F.3d 266, 271 (3d Cir. 2012) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). A disputed issue is only "genuine" if there is a sufficient evidentiary basis upon which a reasonable factfinder could find for the non-moving party. Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A factual dispute is "material" only if it could affect the outcome of the suit under the governing law. Doe v. Luzerne Cnty., 660 F.3d 169, 175 (3d Cir. 2011) (citing Gray v. York Papers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992)). The Court is not tasked with resolving disputed issues of fact, but only with determining whether there exist any factual issues that must be tried. Anderson, 477 U.S. at 247-49.

In considering a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. Macfarlan, 675 F.3d at 271; Bouriez v. Carnegie Mellon Univ., 585 F.3d 765, 770 (3d Cir. 2009). Where there exist factual issues that cannot be resolved without a credibility determination, the court must credit the non-moving party's evidence over that presented by the moving party. Liberty Lobby, 477 U.S. at 255. However, if there is no factual issue presented, and if only one reasonable conclusion could arise from the record with respect to the potential outcome under the governing law, the court must award summary judgment in favor of the moving party. Id. at 250.

The court must review the entire record, but in doing so must take care to "disregard all evidence favorable to the moving party that the jury is not required to believe." Reeves v. Sanderson Plumbing Products, 530 U.S. 133, 150-51 (2000). The task for the court is to examine "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Liberty Lobby, 477 U.S. at 251-52.

## IV. Discussion

### A. Deliberate Indifference

As a legal matter this case is straightforward: the plaintiff claims that Defendant Dros violated his rights under the Eighth Amendment to the United States Constitution by exhibiting deliberate indifference to the risk that the plaintiff was being held beyond his maximum sentence date, and that Dros failed to conduct a sufficiently thorough investigation into all documents in the plaintiff's DC-15 or otherwise contact the sentencing court after Judge Giordano issued the April 17, 2015 order once again advising prison officials that Von Schlichten was to receive credit for all time served in Northampton County. On the facts of this case, we conclude that under the prevailing legal standards it cannot be said that Defendant Dros was deliberately indifferent, or that Dros transgressed Von Schlichten's

clearly established constitutional rights, and hence summary judgment in favor of Defendant Dros is warranted.

The Eighth Amendment to the United States Constitution proscribes the infliction of cruel and unusual punishment. U.S. Const., amend. VIII. It has long been clear that imprisonment beyond one's term of incarceration is punitive within the meaning of the Eighth Amendment. Sample v. Diecks, 885 F.2d 1099, 1108 (3d Cir. 1989) ("[T]here can be no doubt that imprisonment beyond one's term constitutes punishment within the meaning of the [E]ighth [A]mendment."). Prison officials violate the Eighth Amendment when they are deliberately indifferent to an inmate's interest in being free from excessive detention. Id.

To establish liability for a claim of deliberate indifference based upon a prison official's disregard of an inmate's excessive and unlawful confinement, a plaintiff must prove the following three elements: (1) the prison official had knowledge of the inmate's problem and of the risk that unwarranted punishment was being, or would be, inflicted; (2) the official either failed to act or took only ineffectual action under circumstances indicating that his response to the problem was a product of deliberate indifference to the inmate's plight; and (3) a causal connection existed between the official's response to the problem and the infliction of unjustified detention. Sample v. Diecks, 885 F.2d 1099, 1110 (3d Cir. 1989). Relevant circumstances to consider when evaluating these factors are the scope of

the official's duties and the role the official played in the life of the prison.  Id.; see also Montanez v. Thompson, 603 F.3d 243, 252 (3d Cir. 2010).

In Sample, the Third Circuit found a violation of the Eighth Amendment where the record showed that the prison official, Diecks:

> (1) believed Sample's inquiry might well have merit, (2) knew that the matter needed to be clarified, (3) believed Sample had to rely on his (Diecks') efforts alone to rectify the problem, (4) did not follow the relevant procedures mandated by the Pennsylvania Bureau of Correction, (5) took no other remedial action, and (6) did not inform Sample of any other action he (Sample) might take to resolve his problem.

885 F.2d at 1111.

In a later case, the Third Circuit considered claims against parole officials who initially had misinterpreted a judge's sentencing order that resulted in a six-month delay of an inmate's release.  Moore v. Tartler, 986 F.2d 682, 686 (3d Cir. 1993).  Although the officials denied the plaintiff's request for release, they did commence an investigation into his claims that lasted more than five months and eventually resulted in his release from prison.  Id.  The Third Circuit observed that deliberate indifference was more typically demonstrated "in those cases where prison officials were put on notice and then simply refused to investigate a prisoner's claim of sentence miscalculation."  Id. at 686.  In Moore, the Third Circuit also referred to two cases from the Ninth Circuit Court of Appeals,

Haygood v. Younger, 769 F.2d 1350 (9th Cir. 1985), and Alexander v. Perrill, 916

F.2d 1392 (9th Cir. 1990), which the court found pertinent to its analysis:

> In Haygood the prisoner was incarcerated almost five years beyond his lawful term as a result of prison officials' failure to investigate. Because prison officials failed to address Haygood's credible evidence that he was entitled to release, the Court of Appeals for the Ninth Circuit concluded that the prison officials were deliberately indifferent to Haygood's constitutional rights. Similarly in Alexander v. Perrill, a prisoner presented credible evidence that prison officials, after being put on notice, simply refused to investigate a computational error. There prison officials "stood idly by after an inmate raised the proposition that he was being unlawfully incarcerated and had provided documentary evidence in support of his claim."

Moore, 986 F.2d at 686. In Moore, the Third Circuit found that the undisputed

facts showed that the Parole Board did not ignore the inmate's complaint or deviate

from standard operating procedures, and even though the investigation took five

months, it was not so inept or ineffectual as to constitute deliberate indifference.

Id. at 687.

Subsequently, the Court of Appeals considered a similar claim alleging

deliberate indifference based upon a sentence miscalculation, and concluded that

based on the evidence in the record, the DOC official responsible for investigating

the inmate's claims that his sentence had been miscalculated by prison officials

was entitled to qualified immunity from the inmate's claims. In reaching this

conclusion, based on the state of the law at the time, the Court of Appeals found

that it was objectively reasonable for the DOC official to believe that her conduct in responding to the inmate's communicated concerns about the calculation of his sentence was lawful and in keeping with the inmate's constitutional rights where the evidence showed that the DOC official had minimal communication with the inmate, but responded to him timely; where there were no facts in the record to show that the official ignored the inmate's claims or failed to follow established DOC policy during her involvement in the investigation into his claims; where the evidence showed that she took the claims seriously and forwarded the commitment credit issue to supervisory parties to review, including the sentencing judge, and the DOC's central office and legal department; and where the sentencing issues were complicated. <u>Montanez</u>, 603 F.3d at 253-54.

Turning to consideration of the Pennsylvania law governing the sentencing of inmates, we note that the power to award pre-commitment credit for time served is held exclusively by the sentencing court. 42 Pa. Cons. Stat. Ann. §9760; <u>see also</u> <u>Askew v. Kelchner</u>, Civ. A. No. 1:04-CV-0631, 2007 WL 763075, at *5 (M.D. Pa. Mar. 7, 2007). Moreover, DOC employees have no authority to add or delete sentencing conditions that the sentencing court imposes. <u>McCray v. Pa. Dep't of Corrs.</u>, 872 A.2d 1127, 1333 (Pa. 2003). "Because the sentencing court is the entity empowered to award pre-commitment credit, only court commitment documents, like the DC-300B, notify a prison official of his duty to rectify."

Askew, 2007 WL 763075, at *5.  Somewhat similarly to this case, the court in

Askew observed:

> In the instant action, the DC-300B did not provide a pre-commitment credit amount.  Instead, the DC-300B stated simply 'credit for time served.'  Imputing to [the DOC records specialist] responsibility for determining the amount of pre-commitment credit would usurp the statutory obligations of the sentencing court."

2007 WL 763075, at *5.  Instead, when an inmate is committed to the custody of

the DOC, a DC-300B commitment form is provided by the sentencing county.  42

Pa. Cons. Stat. Ann. § 9764(a).  The DC-300B is generated from the Common

Pleas Criminal Court Case Management System.  Id.  Pennsylvania law provides

that the DOC cannot be held liable for relying in good faith upon information

contained in the DC-300B.  42 Pa. Cons. Stat. Ann. § 9764(c.1)(3).  Because the

sentencing court "is the entity empowered to award pre-commitment credit, only

court commitment records, like the DC-300B, notify a prison official of his duty to

rectify."  Askew, 2007 WL 763075, at *5.

In this case, the record is undisputed that when Judge Giordano sentenced

Von Schlichten on September 6, 2013, he directed that Von Schlichten be given

credit for time served while previously in the custody of Northampton County, and

he incorporated as part of his Order the County's DC-300B that was attached to the

Order.  The information contained on the DC-300B prepared by County officials

indicated only that Von Schlichten had been in custody in Northampton County

from February 11, 2013 until September 6, 2013, and omitted any mention of any time that Von Schlichten spent in county prison in 2010. Although the plaintiff argues that other documents from Northampton County were later sent to the DOC and made part of Von Schlichten's DC-15 contained some reference to time spent in custody in 2010, there is no dispute that this information was never included in any DC-300B or Von Schlichten's 16E, and was never explained or identified in any of the Court orders that predated the Order issued on July 31, 2015, which triggered Von Schlichten's release almost immediately upon being received.

When we consider this case in light of the analytical paradigm defined by case law, it is apparent that Dros's actions simply do not rise to the level of deliberate indifference, the exacting standard demanded for an Eighth Amendment claim. As we have noted in <u>Sample v. Diecks</u>, 885 F.2d 1099, 1110 (3d Cir. 1989), the court of appeals defined for us the relevant factors in making this Eighth Amendment assessment stating that a constitutional infraction may be found only when prison officials: (1) believe an inmate's inquiry might well have merit, (2) know that the matter needed to be clarified, (3) believe that the inmate must rely on their efforts alone to rectify the problem, (4) do not follow the relevant procedures mandated by the Pennsylvania Bureau of Correction, (5) take no other remedial action, and (6) do not inform the inmate other action he might take to resolve his problem. <u>Id</u>., 885 F.2d at 1111.

In contrast, in the instant case Dros followed the dictates of state law and relevant prison procedures in April of 2015 when he relied upon the DC-300B provided by state court officials to evaluate the plaintiff's sentence credit calculation. This review of the records that Dros is mandated to rely upon did not initially disclose any sentence calculation error. Dros also counseled Von Schlichten's mother that sentence credit questions should be referred by the plaintiff's counsel to the sentencing court. All of these actions fully comported with the requirements of state law. Furthermore, when he finally received clear direction from the state court in August of 2015 Dros took immediate corrective action. Recognizing that deliberate indifference is typically demonstrated only "in those cases where prison officials were put on notice and then simply refused to investigate a prisoner's claim of sentence miscalculation," Moore v. Tartler, 986 F.2d 682, 686 (3d Cir. 1993), it cannot be said that the course followed by Dros constituted deliberate indifference to Von Schlichten's questions of confinement.

This case is no doubt frustrating for the plaintiff because it does appear that Von Schlichten was held past the date that Judge Giordano may have intended when he sentenced him in 2013. This was a collective failure of the criminal justice system and many actors bear responsibility for this failure. However, the plaintiff is endeavoring to center all blame for any arguable sentence miscalculation with Defendant Dros, when the evidence makes clear that Dros had

no responsibility for the failure of officials to communicate critically important information regarding Von Schlichten's history of incarceration in Northampton County.

Instead, the record indicates a deeply unfortunate failure to communicate effectively at many levels, and by persons other than Defendant Dros. When he became concerned in 2015 that his client had not received full credit for all periods of confinement in Northampton County, the plaintiff's criminal defense lawyer had a meeting with Judge Giordano and the prosecutor and provided the Court with a draft Order that did nothing more than echo the original sentencing Order's directive that Von Schlichten receive credit for all time served. Although it is true that Dros found this Order to be somewhat "vague," nothing in the Order can reasonably be read to state that DOC officials had miscalculated the sentence, and any suggestion by the plaintiff otherwise is an effort in revisionism premised upon the notion that the Order said something other than what it actually did. Moreover, the plaintiff has offered no persuasive legal authority that would have compelled Defendant Dros to contact the Court to seek clarification of the Order when the Order simply directed that the DOC do something that officials believed they were doing, namely, crediting Von Schlichten for the custodial time indicated on the DC-300B. In fact, conducting a further inquiry urged by the plaintiff which in essence would impeach the court's order, as embodied in the DC-300B, would risk

running afoul of the law since it would, in effect, "usurp the statutory obligations of the sentencing court." <u>Askew v. Kelchner</u>, Civ. A. No. 1:04-CV-0631, 2007 WL 763075, at *5 (M.D. Pa. Mar. 7, 2007).

In an effort to bolster his case, the plaintiff strains to craft a narrative that purports to articulate what Judge Giordano was thinking when he issued the April 17, 2015 Order, or narrate what his intentions were in issuing the Order, but bases this narrative entirely on Von Schlichten's defense lawyer's speculative affidavit. Nothing in that affidavit explains how defense counsel had personal knowledge of what Judge Giordano was thinking or intended, and none of those alleged thoughts or intentions are made clear in the abbreviated Order that Judge Giordano issued on April 17, 2015. To the extent Von Schlichten's counsel purports to attest to Judge Giordano's state of mind, counsel's affidavit is entitled to no evidentiary weight as it is no more than counsel's speculation, and an effort to suggest to the Court that Judge Giordano's Order meant something other than what was actually written. It is curious why defense counsel – who was the moving force behind the issuance of the April 2015 Order – declined to draft an Order for Judge Giordano's signature that provided any guidance whatsoever to DOC officials about correcting a sentence calculation issue if that was, in fact, the purpose of the Order.

Moreover, and more fundamentally, this argument highlights a crucial shortcoming in the plaintiff's case. While this argument focuses on the court's

intent in April of 2015 it also casts in sharp relief the fact that the court's intent was never clearly expressed to Dros or the Department of Corrections until August 2015. Given the failure to communicate this intent, we would have to impute a degree of clairvoyance to Dros, and hold him responsible for what the court thought rather than what it said, in order to find him deliberately indifferent in this case. This we are unwilling to do.

The plaintiff also invites us to impute some sort of improper motive or malice to Defendant Dros because in causing Von Schlichten's file to be reviewed for purposes of calculating his sentence, he and others relied on the sentencing Orders and the information contained in the DC-300B. But that is exactly what he was supposed to rely on, both in accordance with statute and Judge Giordano's own Sentencing Order, which explicitly instructed DOC officials that the sentencing Order consisted of his ruling and the information supplied by the County on the DC-300B, which omitted any mention of time that Von Schlichten spent in custody in 2010. We do not find evidence sufficient to show that Dros had knowledge – or should have known – that Von Schlichten's sentence had been improperly calculated, and nothing in the April 2015 Order was sufficient to put him on notice that a mistake had been made.

Dros's reliance on the information in the DC-300B that the County prepared and furnished to the DOC is made further clear in his response to the subpoena that

Von Schlichten's lawyer served in May 2015 after his client had not been released following the issuance of Judge Giordano's second Order.[1]  As part of that response, the DOC produced the three pages of the DC-300B, which is the document the plaintiff and the defendant agree was properly to be used to calculate Von Schlichten's sentence.  Yet the plaintiff now suggests that Dros's response to the subpoena indicates deliberate indifference to Von Schlichten's plight because it did not include additional information from his DC-15, even though this information typically was not used for sentence calculation, and even though nothing in Judge Giordano's April 17, 2015 Order can reasonably be read as informing the DOC that Von Schlichten's sentence calculation was inaccurate.

---

[1]  Another curious aspect of this case is that Von Schlichten's lawyer appears never to have called Defendant Dros or anyone else in the records department at SCI Coal Township to complain that his client had been held past his maximum date, or to explain what he believed was intended by Judge Giordano's second Order. With the clarity of hindsight, this failure by counsel contributed to the length of Von Schlichten's confinement, since it is apparent that prison officials acted promptly once they were clearly alerted to a sentencing credit calculation error. We do not by any means suggest that counsel was derelict in failing to take this step. Rather, we believe that counsel acted in good faith, but the halting and elliptical path followed by counsel delayed the direct communication of essential information to prison officials. The absence of any evidence in the record to show that Dros had any communication or inquiry from counsel further erodes the plaintiff's case, because it shows that Dros was without sufficient information that might have put him notice of a problem.   Therefore, just as counsel cannot be held culpable for failing to convey this information with greater clarity or urgency, neither can Dros be held culpable for failing to understand that which had not been conveyed to him.

Nothing about Defendant Dros's production in response to the subpoena supports the plaintiff's claims in this case.

Finally, Dros's response to Judge Giordano's third and final Order issued on July 31, 2015, and received by the DOC on August 10, 2015, does nothing to help Von Schlichten's claim and in fact substantially undermines it. The undisputed evidence indicates that after Judge Giordano issued the Order on July 31, 2015, it was not mailed until August 4, 2015, and then took nearly one week to arrive at the DOC. Whatever the reasons for this delay they certainly cannot be attributed to anything Dros did, and the parties agree that once Dros learned of the Order he acted with dispatch, promptly notifying officials and expediting the process of having Von Schlichten released from DOC custody the very next day. No reasonable factfinder could interpret this final piece of evidence as demonstrating deliberate indifference on the part of Defendant Dros with respect to the calculation of Von Schlichten's sentence.

There is one final issue we find it necessary to address regarding the plaintiff's effort to characterize Judge Giordano's Orders in a way that is both unreasonable and unsupported by any evidence that we can perceive in the record. The plaintiff has insisted that although Judge Giordano manifestly issued three separate Orders in Von Schlichten's case with respect to his sentence and its calculation, these Orders really should not be considered separate from one another

even though they were issued years and months apart, since each was meant to convey the same information to DOC officials. But the plaintiff's argument ignores not just the fact that three separate Orders were issued, but also ignores the actual text of the Orders, and his attempt to characterize Judge Giordano's intentions behind each separate Order is based on the affidavit of a lawyer who is not entitled to speak for the Judge.

For example, Defendant Dros correctly asserts that "On April 17, 2015, the Court of Common Pleas of Northampton County issued a second order which stated 'Eric Von Schlichten is to receive credit for all time served in Northampton County towards his sentence.'" (Def. SMF ¶3.) The plaintiff purports to dispute this basic fact, arguing that "[t]he Order that the Court of Common Pleas of Northampton County issued on April 17, 2015 did not change or modify Eric's original sentence and therefore was not a 'second order.' Rather the Order was issued to ensure that the Court's initial award of credit for time served was being correctly applied." (Pl. SMF ¶3.) The only evidence relied on in support of this "dispute" is Von Schlichten's defense counsel's affidavit in which he purports to interpret the meaning of the Order and the purpose behind its issuance. The April 2015 Order was, in fact, a second Order, and it says what it says – and says nothing about alleged inaccuracies in Von Schlichten's sentence computation.

The plaintiff likewise disputes that a "third Order" was issued on July 31, 2015, again straining to argue that the July 31 Order was really nothing more than an effort to enforce the terms of the original order, again based on counsel's own attestation of Judge Giordano's state of mind. (Def. SMF ¶5; Pl. SMF ¶5.) But in the plaintiff's telling the three Orders were of a piece, and all were simply meant to enforce what Judge Giordano originally ordered with respect to Von Schlichten's sentence computation. Review of what that original Order said is instructive here.

The original sentencing Order directed that Von Schlichten was "to be given credit for time served, with no periods of duplicate credit." (DEF000677.) The Order further stated that "this Order and the attached Northampton County Court of Common Pleas Sentencing Sheet are to be considered the Sentencing Order by the Pennsylvania Department of Corrections. The sentencing sheet *accurately reflects* the sentence of this Court at the above-referenced case number." (Id.) (emphasis added.) What was attached, and incorporated as the accurate reflection of Von Schlichten's sentence, was the DC-300B prepared by officials of Northampton County. That DC-300B provides only that the plaintiff was in custody in Northampton County on each of the docket numbers from February 11, 2013, until September 6, 2013. (DEF000672, DEF000679, DEF000684.)

Thus, even if the plaintiff were correct that Judge Giordano's second Order was issued to ensure that the original sentencing Order was being properly applied,

that original Order expressly informed DOC officials that the DC-300B "accurately reflects the sentence of this Court" – something that Judge Giordano's third Order seems to modify, since it for the first time laid out for DOC officials other dates in 2010 during which Von Schlichten was in custody on the relevant docket numbers, and for which he should be given credit. Upon receipt of this third and final Order, DOC officials immediately recalculated Von Schlichten's sentence, and he was released from custody the next day. That is not deliberate indifference, and in fact reflects care and attention on the part of Dros.

In summary, although it is indeed unfortunate that Eric Von Schlichten's sentence was originally calculated to credit only the time reflected on the DC-300B that Northampton County and Judge Giordano furnished to DOC officials, there is no evidence that can reasonably be interpreted to suggest that Defendant Dros was deliberately indifferent to the proper calculation of Von Schlichten's sentence, and Von Schlichten's efforts to shift responsibility for this unfortunate confusion onto Defendant Dros is unreasonable and not substantiated by the record in this case. Summary judgment is therefore warranted.

## B. Qualified Immunity

Even if the record left some room for doubt on the merits of the plaintiff's claim, we would find that Defendant Dros would be entitled to qualified immunity.

The doctrine of qualified immunity shields governmental officials from civil liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Mullenix v. Luna, -- U.S. -- , 136 S. Ct. 305, 308 (2015) (per curiam). The qualified immunity inquiry has two parts. The first asks whether the plaintiff has alleged sufficient facts to "make out a violation of a constitutional right." Pearson v. Callahan, 555 U.S. 223, 232 (2009). The second question is "whether the right at issue was clearly established at the time of [the] defendant's alleged misconduct." Id. (internal quotation marks omitted). A court may "exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis" to address first "in light of the circumstances of the particular case at hand." Pearson, 555 U.S. at 236.

A right is "clearly established" when, "at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)) (alterations in original). "If no case speaks directly to the legality of the officer's conduct, the challenged conduct [needs] to be such that reasonable officers in the defendant['s] position at the relevant time could have believed, in light of what was in the decided case law, that their conduct was lawful." Geist v.

Ammary, 40 F. Supp. 3d 467, 485 (E.D. Pa. 2014) (citing Giuffre v. Bissell, 31 F.3d 1241, 1255 (3d Cir. 1994)) (internal quotations omitted).

Qualified immunity is intended to immunize governmental officials from liability except in those cases where it would be objectively unreasonable for officers to believe that their conduct was warranted. As the Third Circuit recently observed, "[t]hat threshold is a high one." Thompson v. Howard, -- F. App'x --, 2017 WL 655763, at *4 (Feb. 17, 2017). The doctrine exists because "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly" believe that their actions are justified and permissible. Anderson, 483 U.S. at 641. Qualified immunity thus "gives ample room for mistaken judgments" and "protect[s] all but the plainly incompetent or those who knowingly violate the law." Kelly v. Borough of Carlisle, 622 F.3d 248, 254 (3d Cir. 2010) (internal quotation marks and citations omitted). For that reason, qualified immunity applies unless it is "beyond debate" that an officer acted unreasonably, Mullenix, 136 S. Ct. at 309, and unless "every reasonable official would [have understood] that what he [was] doing violate[d]" the right at issue. Reichle v. Howards, 566 U.S. 658, 132 S. Ct. 2088, 2093 (2012) (internal quotation marks and citation omitted) (first alteration in original). As the Supreme Court clarified, while "[w]e do not require a case directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." Mullenix, 136 S. Ct. at 308.

In the context of excessive prolonged confinement claims, like the claim advanced here, Montanez v. Thompson, 603 F.3d 243, 252 (3d Cir. 2010), informs how qualified immunity applies in this field. In Montanez, the court of appeals concluded that government officials were entitled to qualified immunity when those officials did not ignore sentence calculation concerns, but instead informed the inmate to address these concerns with the sentencing court, and investigated the prisoner's concerns in a fashion which complied with state law and institutional practice. That is also precisely what happened here.

The facts of this case, which are largely undisputed, make this a textbook case where qualified immunity should apply. Those facts indicate that DOC officials who were originally responsible for calculating Von Schlichten's sentence did so accurately, by following Pennsylvania statutory law and the text of Judge Giordano's Order, and credited Von Schlichten for a period of time while he was in county custody, as reflected on his DC-300B. Defendant Dros had nothing to do with this original calculation.

The facts further reveal that that upon receipt of Judge Giordano's second Order, which said little more than the original sentencing Order, Defendant Dros and the DOC determined that Von Schlichten's sentence had been appropriately calculated and took no further action. Defendant Dros's response to the subpoena requesting information on the sentence calculation accurately and appropriately

furnished the copy of the plaintiff's DC-300B that had been used. The plaintiff has offered no clear or persuasive authority that would have caused a reasonable corrections official to believe that he was violating the law by confirming the original sentence calculation against the very documents that he was supposed to consult in making such a calculation, or that he violated the law by providing the documents that prison officials used – and were supposed to use – in calculating an inmate's sentence.

We have already found that the facts of this case could not support a finding of a constitutional violation, and thus based on the first prong of Pearson alone Dros is entitled to qualified immunity. Furthermore, even if the record contained evidence to suggest that Dros could have done more to ensure that Von Schlichten's sentence had been appropriately calculated, or even if it would have been helpful to contact the Judge's chambers to get clarification on what he meant when he issued the second Order, nothing in the law required that Dros take these steps, and there is simply insufficient evidence in the record that would have arguably placed him on notice that Von Schlichten may have been held past his maximum release date and that such inquiry was necessary. Moreover, the doctrine of qualified immunity is intended to protect officials from making those kinds of judgments, and gives ample room for the possibility that sometimes mistakes will be made. In this case, the evidence would not support a finding of a

constitutional violation in the first place, and the law of qualified immunity would further insulate Defendant Dros from liability for his actions taken with respect to his role in calculating the plaintiff's sentence or interpreting Judge Giordano's Orders.

In reaching this result we close as we began. The prolonged detention of Eric Von Schlichten, while tragic, presented a collective failure of the criminal justice system, a confluence of events caused by a multitude of actors, none of whom acted with deliberate indifference to Von Schlichten's needs, but all of whom could have taken further steps to avoid presenting Defendant Dros with a painfully ambiguous order in April, of 2015. While Dros' inability to initially untangle the web of confusion created by others in April of 2015 was regrettable, it simply was not deliberately indifferent to Von Schlichten's needs. Nor did it violate Von Schlichten's clearly established constitutional rights. Therefore, under the prevailing legal standards governing Eighth Amendment claims and qualified immunity, the defendant is entitled to a judgment in his favor.[2]

An appropriate Order follows.

---

[2] While we reach this result because we find it is compelled by the law on these facts, we note that the parties had previously, and unsuccessfully, attempted to mediate this dispute. In light of the clarifying guidance which we provide today, given the wholly regrettable circumstances of this case, and mindful of the litigative risk that all parties face moving forward, IT IS ORDERED that within the next 30 days counsel shall consult, and confer with one another with an eye towards trying to further mediate and resolve this case on mutually acceptable terms.